# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
**No. 21-716V**

| | |
|---|---|
| MICHELLE GUYETTE,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: June 29, 2026 |

*Jonathan Joseph Svitak, Shannon Law Group, P.C., Woodridge, IL, for Petitioner.*

*Alyssa M. Petroff, U.S. Department of Justice, Washington, DC, for Respondent.*

## FACT RULING DISMISSING TABLE CLAIM & SCHEDULING ORDER[1]

On January 12, 2021, Michelle Guyette filed a Petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a shoulder injury related to vaccine administration ("SIRVA") – a Table injury – as a result of an influenza ("flu") vaccine administered to her on November 3, 2019.[3] Pet. at 1, ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons set forth below, I find it more likely than not that the onset of Petitioner's injury did not occur within 48 hours of vaccination. Petitioner's Table claim is

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

[3] Petitioner *has not* alleged, in the alternative, that her subject flu vaccination was the cause-in-fact of her shoulder injury and/or significantly aggravated a condition. *See generally* Pet.

thus not tenable (although the matter may remain viable as a causation-in-fact claim - when and if Petitioner amends the instant Petition).

## I. Relevant Procedural History

Following a medical review, Respondent determined this matter was not appropriate for compensation. ECF No. 32. Respondent thereafter filed his Rule 4(c) Report defending this case in January 2024, and arguing (among other things)[4] that the filed record does not preponderantly establish a 48-hour onset. ECF No. 33 at 8-10 (internal citations omitted).

In reaction, Petitioner submitted a brief addressing the arguments raised in Respondent's Rule 4(c) Report, and arguing that she can preponderantly establish entitlement for both Table and off-Table SIRVA claims. Br., ECF No. 37 at 12-19. Respondent reacted to Petitioner's arguments in his response brief filed on May 1, 2025. Resp., ECF No 38. Respondent maintained that Petitioner's injury was inconsistent with a Table SIRVA claim, and that she cannot establish a shoulder injury in pursuit of a causation-in-fact claim. *Id.* at 17-23. This matter is now ripe for consideration.

## II. Relevant Medical Evidence

I have reviewed all of the medical records and evidence filed to date. Only such information related to the critical issue of onset will be discussed herein, though other facts may be included as necessary.

Petitioner received the subject flu vaccine in her left deltoid on November 3, 2019. Ex. 4 at 1. Approximately twelve days post vaccination (November 15, 2019), Petitioner (a pediatric nurse) had a visit for back pain with a treater with whom she worked. Ex. 2 at 437-40. The contemporaneous visit notes do not contain reports of left shoulder symptoms. *See id.*

The medical records next appear to contain documentation of Petitioner's visit with a chiropractor on November 18, 2019. Ex. 7 at 4. While Petitioner contends that she complained of left shoulder pain during this visit (Br. at 7), the relevant visit notes are handwritten and entirely illegible.

---

[4] Respondent also contested Petitioner's ability to establish other SIRVA claim elements, contending that her pain was not limited to the vaccinated shoulder (with pain extending into the neck and left arm/hand/fingers), and that there exists the presence of other conditions or abnormalities that would better explain her post-vaccination symptoms (e.g., cervical radiculopathy and scapular dyskinesis in the left shoulder). Respondent's Report at 9-10 (internal citations omitted). And, even if she could establish a Table-consistent claim, Petitioner reported her pain began after lifting puppies – thus supporting the existence of a more likely alternative cause of her injury. *See id.*

The next day (November 19, 2019), Petitioner sought medical treatment at an urgent care facility for complaints of left shoulder pain. Ex. 1 at 44. She reported "x4 days [of] weakness with shooting pain into elbow [n]o injury[.]" *Id.* Petitioner also noted that she had "16 lb puppies that she ha[d] been caring [sic]." *Id.* at 45. Petitioner did not link her left shoulder pain to her receipt of the subject early-November vaccination.

On November 21, 2019, Petitioner returned to the provider with whom she worked for "left shoulder joint pain." Ex. 2 at 451. The records do not contain visit notes, examination findings, or any reports concerning the onset of Petitioner's left shoulder pain. *See id.* Then, on November 22, 2019 – 19 days post vaccination – Petitioner had a visit with her primary care provider ("PCP") for evaluation of "left ongoing shoulder pain." Ex. 1 at 31. Petitioner reported that her shoulder pain "started on 11/17" with "soreness in her back and then on 11/18 when she [woke up] it was worse." *Id.* at 32. The PCP noted that Petitioner did not report an injury or trauma, but stated she was "recently carrying 16 pound puppies[;] she heard a pop in her shoulder earlier when she picked them up[.]" *Id.* Petitioner also explained that she "[h]ad a lumpectomy on the left breast a month and a half ago and had flu shot in th[e left] arm two weeks ago." *Id.*

During that visit, Petitioner's PCP ordered an x-ray of Petitioner's left shoulder. Ex. 1 at 34. The history for this procedure stated that Petitioner experienced an "[i]njury four days ago [on November 18, 2019,] with swollen left shoulder joint that is warm." *Id.* at 4.

The same day (November 22, 2019), Petitioner's PCP enlisted the opinion of an orthopedist regarding Petitioner's injury. Ex. 2 at 456. Petitioner's PCP explained that Petitioner had "left arm weakness x 4 days with shooting pain from her shoulder to her elbow[.]" *Id.* The treater also reiterated that Petitioner heard a "pop" in her shoulder "when this all started while she was lifting up a 16[-]pound puppy." *Id.*

Petitioner underwent a cervical spine MRI[5] on November 26, 2019. Ex. 2 at 495. The reason for the MRI was listed as "mild trauma from lifting a puppy one week ago [November 19, 2019,] but now progressive neuropathy with pain and weakness in her left arm that is not responding to any over the counter or clinical interventions." *Id.* at 496.

Following a call between Petitioner and her PCP on December 6, 2019, the treater noted that Petitioner had a "two[-]week history of persistent and worsening left arm numbness and tingling not responding to [treatment]." Ex. 2 at 516. This would place the onset of Petitioner's left arm symptoms (albeit inconsistent with typical SIRVA symptoms or pain and restricted motion)[6] around November 22, 2019.

---

[5] The MRI was consistent with cervical radiculopathy. *See* Ex. 2 at 497; *see also id.* at 679.

On December 23, 2019, Petitioner saw a physical medicine and rehabilitative specialist for her left arm pain. Ex. 1 at 172. She reported "6 weeks [of] severe radiating left arm pain. Onset p [sic] flu shot." *Id.* Petitioner noted that "[i]nitially" her pain was isolated to the left shoulder, "but soon after spread to the left neck and down the left arm with tingling/numbness [in the] left hand." *Id.* The treaters impression was "severe L C6 radiculopathy x 6 weeks" or thus since November 11, 2019. *Id.* at 173. This was the first time Petitioner linked the onset of her pain to her subject flu vaccination.

Petitioner began physical therapy ("PT") on December 31, 2019. Ex. 1 at 182. Petitioner described the onset of her left shoulder pain as beginning "7 weeks" ago – or thus around November 12, 2019. *Id.* She also noted that she experienced a "gradual onset and [] insidious onset . . . after she had flu shot into left shoulder." *Id.* Petitioner explained that her symptoms began in the left shoulder then "progressed into neck pain and eventually down [left upper extremity.]" *Id.*

The following month, on January 28, 2020, Petitioner saw a different physical medicine and rehabilitative specialist. Ex. 3 at 85. Petitioner reported a "3 months" history of neck pain that "radiates mainly to: neck and left shoulder[.]" *Id.* Petitioner's chief complaint was not her left shoulder, specifically, and her report of a three-month history would place onset in October 2019, thus pre-vaccination.

On January 31, 2020, Petitioner followed up with her PCP's office for "left-sided cervical radiculopathy present for 3-4 months." Ex. 1 at 142. She also complained of left upper extremity tingling, a heavy sensation, bicep weakness, swelling of the left lateral neck and upper shoulder, and numbness/tingling in the left hand/fingers. *Id.* Petitioner explained that "[w]hen she [moved] her shoulder around she notice[d] temperature changes in her hand." *Id.* The treater did "not think [the] source of [Petitioner's] symptoms [was] from [her] shoulder[.]"[7] *Id.* at 145.

Petitioner returned to her PCP's office on February 18, 2020, for a chief complaint of shoulder pain. Ex. 1 at 115. She reported "neck and shoulder pain, numbness and tingling and weakness in L arm x approx [sic] 3 months . . . beginning in November 2019[.]" *Id.* Petitioner noted that she had a "flu shot done few days prior to symptoms and they began with excruciating shoulder pain." *Id.* She also noted, however, that she experienced "[n]o trauma except for picking up a puppy in awkward position around that time." *Id.*

---

[6] The PCP noted the impression as cervical disc disorder. *See* Ex. 2 at 516; *see also* Ex. 1 at 10.

[7] The PCP's assessment included cervical radiculopathy and cervical disc disorder. Ex. 1 at 144.

Petitioner sought care with a neurologist for her left arm and shoulder symptoms on February 26, 2020. Ex. 2 at 674. She reported that "[i]n November 2019[,] she developed several days of left scapular and shoulder pain radiating into the upper arm[,]" which later progressed down into her hand.[8] *Id.* at 675. Petitioner did not link her pain to the subject vaccination at that time.

Later, on July 20, 2020, Petitioner had a phone consultation with an orthopedist. Ex. 2 at 824. Petitioner reported "~9 months of pain in her shoulder" that she "relate[d to] her . . . getting her flu shot in November, when symptoms developed ~4 days later." *Id.* The orthopedist assessed Petitioner with left shoulder joint pain, bursitis, and acromioclavicular arthropathy. *Id.* at 824-25.

On November 9, 2020, Petitioner sought a second opinion from another orthopedist. Ex. 2 at 1049. She reported "left shoulder pain since November 2019. Describe[d] starting having pain after vaccination."[9] *Id.* During a follow-up visit with the same treater on May 4, 2021, Petitioner stated that her left shoulder pain was present "since November 2019. Attribute[d] to flu vaccine originally." *Id.* at 1251. No other medical records related to the onset of Petitioner's left shoulder symptoms have been filed.

## III. Declaration Evidence

In her April 2022 declaration, Petitioner attested that when she received the flu vaccine on November 3, 2019, she "experienced an odd flushing feeling and . . . grabbed [her] left shoulder and made a comment to the nurse who administered the vaccine." Ex. 6 ¶ 3. By the "next morning," her left shoulder pain was worse and her arm "felt heavy and warm." *Id.* ¶ 4. She recalled that by November 5, 2019, her arm was stiff, and she could not lift it without pain. *Id.*

Petitioner also asserted that when she sought care on November 15, 2019, she reported to her treater that she was experiencing "intense shoulder pain after receiving the influenza vaccine." Ex. 6 ¶ 6. She also contended that the treater examined her left arm during that visit and agreed it was swollen and hot to touch. *Id.* Petitioner stated that "[f]rom November 4, 2019 through present," she experienced left shoulder pain. *Id.* ¶ 14. No other declaration evidence bearing on the onset of Petitioner's pain has been submitted.

---

[8] The neurologist's impression was cervical radiculopathy, and he noted that Petitioner's MRI supported this even though her later EMG "was negative[.]" Ex. 2 at 679. Specifically, the MRI, "the much better test, ha[d] already been done and demonstrate[d] an abnormality that explain[ed] the symptoms." *See id.*

[9] The treater's impression was left shoulder scapular dyskinesis. Ex. 2 at 1053.

## IV. Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the Petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[10] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

Section 11(c)(1) also contains requirements concerning the type of vaccination received and where it was administered, the duration or significance of the injury, and the lack of any other award or settlement. *See* Section 11(c)(1)(A), (B), (D), and (E). With regard to duration, a petitioner must establish that he suffered the residual effects or complications of such illness, disability, injury, or condition for more than six months after the administration of the vaccine. Section 11(c)(1)(D).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests *all* of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

---

[10] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g*. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs*., No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## V. Onset Findings of Fact

After a review of the entire record, I find that Petitioner has not preponderantly established an onset of pain within the two-day timeframe set for a SIRVA claim.[11] 42 C.F.R. §§ 100.3(a)(XIV)(B) and 100.3(c)(10)(ii) (QAI criteria)).

The Vaccine Act instructs that a special master may find the time period for the first symptom or manifestation of onset required for a Table Injury is satisfied "even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such a period." Section 13(b)(2). However, consistent with Petitioner's burden of proof overall, that finding must be supported by preponderant evidence. *Id*.

As Respondent has established, Petitioner's own contemporaneous statements to her treaters consistently place onset *outside* the Table's two-day window. Respondent's Report at 17-19 (internal citations omitted). And Petitioner did not consistently relate her shoulder pain to the subject vaccination, first reporting that she experienced no injury prior to the onset of her pain until she had been carrying puppies (at which time she heard a "pop"). *Id.* at 19. Thus, the only statements that support Table onset are those made in Petitioner's declaration, drafted nearly two-and-a-half years post vaccination. *Id.*

In addition, other medical records do not provide support for onset occurring within 48 hours of vaccination. In particular, during the first post-vaccination visit for left shoulder pain (on November 19, 2019 – 16 days post vaccination), Petitioner identified an onset *four days before*, or thus around November 15, 2019, which was twelve days post vaccination. Ex. 1 at 44. This description is in direct contrast to her statement that she had experienced pain the day following her vaccination. *Compare* Ex. 1 at 44, *with* Ex. 6 ¶ 14. Notably, Petitioner also did not attribute her shoulder symptoms to her receipt of the subject flu vaccine at that time, but rather stated that she had been carrying 16-pound

[11] Petitioner's failure to satisfy any one Table criteria under the QAIs precludes her from establishing a Table claim. Thus, I do not find it necessary to decide the remaining disputed issues within this Ruling.

puppies. Ex. 1 at 45. This entry thus weighs heavily against such a favorable onset finding, since Petitioner provided a specific timeframe of onset that exceeded two days post vaccination.

The vast majority of Petitioner's remaining medical records describe onset as occurring in mid-to-late November 2019, thus well outside the Table's two-day window for a vaccination that was administered earlier that month. *See,* e.g., Ex. 1 at 31-32 (a November 22, 2019 report that her pain started "on 11/17 . . . then on 11/18 . . . it was worse."); Ex. 2 at 495-96 (a November 26, 2019 report of onset "one week ago" or around November 19, 2019); *id.* at 516 (a December 6, 2019 report of a "two[-]week history" of left arm symptoms, thus beginning around November 22, 2019); Ex. 1 at 182 (a December 31, 2019 report of shoulder pain beginning "7 weeks" ago, or around November 12, 2019).

Notably, many of these records do not describe onset as beginning after her receipt of a flu vaccine, but rather corroborate her initial reporting and identify the cause of her pain as lifting puppies. *See,* e.g., Ex. 1 at 32 (a November 22, 2019 report that she did not experience a trauma or injury but had recently been "carrying 16 pound puppies[;] she heard a pop in her shoulder earlier when she picked them up[.]"); Ex. 2 at 496 (a November 26, 2019 report of "mild trauma from lifting a puppy").

There are some records that do support onset as beginning following Petitioner's receipt of a flu vaccine, yet they also fail to report the pain as beginning within two days of vaccination. For example, during Petitioner's December 23, 2019 visit (the first visit wherein she noted a status "p [sic] flu shot"), she reported that the onset of her left arm pain began "6 weeks" ago, or thus around November 11, 2019 – eight days post vaccination. Ex. 1 at 172-73. Similarly, on December 31, 2019, Petitioner reported a seven-week history of shoulder pain (thus beginning around November 12, 2019, nine days post vaccination); and she also noted a "gradual onset and [] insidious onset . . . after she had flu shot into left shoulder." *Id.* And, on July 20, 2020, Petitioner described a "~9 months" history of pain in her shoulder that she "relate[d to] her . . . getting her flu shot in November, when symptoms developed *~4 days later*." Ex. 2 at 824 (emphasis added). These entries thus do not advance Petitioner's onset contentions.

While Petitioner's records from her February 18, 2020 PCP visit provide at least *partial* support for an onset of left shoulder symptoms following Petitioner's receipt of a flu vaccine in November 2019 (while still mentioning the physical carrying injury she reported), Petitioner still stated that she had received a flu vaccine a "*few days* prior to symptoms" in her shoulder. *See* Ex. 1 at 115 (emphasis added). Even construed in the light most favorable to Petitioner, a "few days" can reasonably be construed as consistent with more than two (especially given the other evidence suggesting a longer onset

timeframe). This entry likewise does not provide support for an onset of shoulder pain that began within two days of Petitioner's November 3, 2019 flu vaccination.

Finally, although some of Petitioner's later records describe an onset of her left shoulder symptoms beginning *generally* in November 2019 following a vaccination, those records cannot tip the scales in Petitioner's favor on onset, especially when weighed against the bulk of the earlier record evidence wherein she so clearly described onset as beginning *at least* four days post-vaccination (but likely longer). *See,* e.g., Ex. 2 at 1049 (a November 9, 2020 report of "left shoulder pain since November 2019 . . . starting . . . after vaccination"); *id.* at 1251 (a May 4, 2021 report of pain "since November 2019. Attribute[d] to flu vaccine originally."). In fact, such reports were made fairly close in time to *or after* the filing of the instant claim (filed on January 12, 2021), and thus must be given significantly lesser weight than those statements made closer in time to her November 2019 vaccination, supporting a mid-to-late November onset.[12]

In light of the above, there is not preponderant evidence that Petitioner experienced left shoulder pain within 48 hours of her November 3, 2019 vaccination.

## Conclusion

At bottom, it is the overall mix of onset evidence herein that causes me to find Petitioner's Table claim cannot be preponderantly established. Petitioner has not provided preponderant evidence that the onset of her shoulder pain was within 48 hours of the subject vaccination. Nevertheless, a non-Table claim for an injury *likely* encompassing symptoms outside the vaccinated shoulder that may be cervical in nature *could* be viable, and I therefore do not dismiss the case in its entirety at this time.

---

[12] While the decision to pursue litigation does not per se render all of a claimant's subsequent efforts at treatment suspect, it does mean the reliability of statements made about fact issues to be adjudicated might be fairly called into question, especially to the extent the statements are not contemporaneous with the event at issue. *Reusser v. Sec'y of Health & Hum. Servs.,* 28 Fed. Cl. 516, 523 (1993) ("written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later"); *Mueller v. Sec'y of Health & Hum. Servs.,* No. 06-775V, 2011 WL 1467938, at *9 (Fed. Cl. Spec. Mstr. Mar. 16, 2011) ("[m]emories are generally better the closer in time to the occurrence reported and when the motivation for accurate explication of symptoms is more immediate."); *Thelen v. Sec'y of Health and Hum. Servs.,* No. 90-22V, 1991 WL 38084, at *11 (Fed. Cl. Spec. Mstr. Mar. 6, 1991) (stating that the pressures of litigation may affect memory). Special masters have afforded less weight to statements made to treating physicians when made in the context of litigation, or those made after a petitioner began to suspect he might have a Program claim. *See,* e.g., *Rastetter v. Sec'y of Health & Hum. Servs.,* No. 19-1840V, 2023 WL 5552317, at *10 (Fed. Cl. Spec. Mstr. Aug. 3, 2023) (affording little weight to a statement made after a 17-month gap in treatment, where the petitioner told the treater the return to care was at the direction of the lawyer); *Duda v. Sec'y of Health & Hum. Servs.,* No. 19-31V, 2021 WL 4735857, at *8 (Fed. Cl. Spec. Mstr. Aug. 10, 2021) (affording less weight to later statements made for the purposes of litigation that directly conflicted with earlier reports to treaters).

As the parties have never attempted to informally resolve the issue of damages in this case, I strongly urge the parties to make one *brief* attempt at settlement, since the case will otherwise be transferred out of SPU thereafter so that Petitioner can attempt to establish a causation-in-fact claim – likely requiring the retention of experts to amplify Petitioner's claim.

Finally, I will note that as the record currently stands, and while the parties have preliminarily addressed (without expert support) an off-Table claim for an injury that may or may not have been cognizable as a shoulder injury (e.g., Br. at 16-19; Resp. at 22-23), it does not appear that Petitioner has alleged an injury in the causation-in-fact context within the instant Petition; if she wishes to continue with her off-Table claim, she must amend her Petition.

Accordingly, Petitioner's Table SIRVA claim is **DISMISSED.** Petitioner shall file an amended Petition and a joint status report confirming that she has provided Respondent with a settlement demand for her off-Table claim (and one that takes into account litigative risk in attempting to prove a non-Table SIRVA that did not begin within two days of the subject vaccination), and the parties' efforts towards informal resolution, **by no later than Wednesday, July 29, 2026.** If the parties do not report progress in their efforts soon thereafter, the matter will be transferred out of SPU.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master